1   BARRY J. PORTMAN
    Federal Public Defender
2   JOYCE LEAVITT
    Assistant Federal Public Defender
3   555 - 12th Street
    Suite 650
4   Oakland, CA 94607-3627
    Telephone:  (510) 637-3500
5
    Counsel for DANNY J. WILSON
6

7

8                   IN THE UNITED STATES DISTRICT COURT

9                FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,         )   No. CR 08-00262 SBA
                                       )
12                   Plaintiff,        )   **DEFENDANT'S NOTICE, MOTION**
                                       )   **AND MEMORANDUM IN SUPPORT OF**
13   vs.                               )   **MOTION TO SUPPRESS EVIDENCE**
                                       )
14   DANNY J. WILSON,                  )   Date: September 16, 2008
                                       )   Time: 11:00 a.m.
15                   Defendant.        )   Court: Saundra Brown Armstrong
     _____ )

16

17

18

19

20

21

22

23

24

25

26

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Warrantless Seizure of Mr. Wilson's Computer . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Warrant Search of Mr. Wilson's Computer . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Execution of the Warrant Search of Mr. Wilson's Computer . . . . . . . . . . . . . . 5

    D.    The Warrant to Obtain the Contents of the AOL E-Mail Account . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    The Warrantless Seizure of Mr. Wilson's Computer Violated The
           Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    The Unreasonable Long Detention of Mr. Wilson's Computer
           Violated The Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    The Warrant Affidavit Did Not Establish Probable Cause . . . . . . . . . . . . . . . . 10

    D.    The Warrant Affidavit Included Material Misstatements And Omitted
           Material Information, Without Which It Would Not Have Established
           Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    E.    The Warrant Was Not Executed Within The Time Specified . . . . . . . . . . . . . . 14

    F.    The Affidavit Did Not Establish Probable Cause For The AOL Warrant . . . . . . 15

    G.    The AOL Warrant Affidavit Included Material Misstatements
           And Omitted Material Information, Without Which It Would Not Have
           Established Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Belmontes v. Brown*,
    414 F.3d 1094 (9th Cir. 2005) ........................................................ 12

*Franks v. Delaware*,
    438 U.S. 154 (1978) .............................................................. 12, 13

*G&G Jewelry, Inc. v. City of Oakland*,
    989 F.2d 1083 (9th Cir. 1993) ........................................................ 8

*Henry v. United States*,
    361 U.S. 98 (1959) ................................................................. 10

*Illinois v. Gates*,
    462 U.S. 213 (1983) ................................................................ 10

*Sgro v. United States*,
    287 U.S. 206 (1932) ................................................................ 14

*Soldal v. Cook County*,
    506 U.S. 56 (1992) .................................................................. 8

*United States v. Adjani*,
    452 F.3d 1140 (9th Cir. 2006) ........................................................ 8

*United States v. Chesher*,
    678 F.2d 1353 (9th Cir. 1982) ....................................................... 12

*United States v. Comprehensive Drug Testing, Inc.*,
    513 F.3d 1085 (9th Cir. 2008) ........................................................ 8

*United States v. Delgadillo-Velasquez*,
    856 F.2d 1292 (9th Cir. 1988) ........................................................ 8

*United States v. Greany*,
    929 F.2d 523 (9th Cir. 1991) ........................................................ 10

*United States v. Hall*,
    142 F.3d 988 (7th Cir. 1998) ......................................................... 9

*United States v. Hill*,
    459 F.3d 966 (9th Cir. 2006) ..................................................... 11, 12

*United States v. Lacy,*
   119 F.3d 742 (9th Cir. 1997) .......................................................................11

*United States v. Martin,*
   157 F.3d 46 (2d Cir. 1998) ........................................................................... 9

*United States v. Nepstead,*
   424 F.2d 269 (9th Cir. 1970) ..................................................................... 14

*United States v. Place,*
   462 U.S. 696 (1983) ............................................................................... 8, 9

*United States v. Rabe,*
   848 F.2d 994 (9th Cir. 1988) ..................................................................... 10

*United States v. Repress,*
   9 F.3d 483 (6th Cir. 1993) ........................................................................... 9

*United States v. Stanert,*
   762 F.2d 775 (9th Cir. 1985) ..................................................................... 12

*United States v. Tamura,*
   694 F.2d 591 (9th Cir. 1982) .................................................................... 8, 9

*United States v. Washington,*
   797 F.2d 1461 (9th Cir. 1986) ................................................................... 10

## FEDERAL STATUTES

Fed. R. Crim. P. 41(e)(2)(A)(i) ................................................................. 14, 15

1    BARRY J. PORTMAN
     Federal Public Defender
2    JOYCE LEAVITT
     Assistant Federal Public Defender
3    555 - 12th Street
     Suite 650
4    Oakland, CA 94607-3627
     Telephone: (510) 637-3500
5
     Counsel for DANNY J. WILSON
6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,          )   No. CR 08-00262 SBA
                                        )
12                      Plaintiff,      )   **DEFENDANT'S NOTICE, MOTION**
                                        )   **AND MEMORANDUM IN SUPPORT OF**
13   vs.                                )   **MOTION TO SUPPRESS EVIDENCE**
                                        )
14   DANNY J. WILSON,                   )   Date: September 16, 2008
                                        )   Time: 11:00 a.m.
15                      Defendant.      )   Court: Saundra Brown Armstrong
     _____)
16

17   TO:    UNITED STATES OF AMERICA, PLAINTIFF; AND JOSEPH RUSSONIELLO,
            UNITED STATES ATTORNEY; AND JAMES MANN, ASSISTANT UNITED
18          STATES ATTORNEY

19          PLEASE TAKE NOTICE that counsel for defendant Danny J. Wilson hereby moves this

20   Court for an order suppressing the computer, and all fruits thereof, that was seized without a

21   warrant from his home.

22          The motion is based on this notice and motion, the following memorandum of points and

23   authorities, the Fourth Amendment to the United States Constitution and all other applicable

24   constitutional, statutory and case authority, and such evidence and argument as may be presented

25   at the hearing of this motion.

26

# INTRODUCTION

**A.      The Warrantless Seizure of Mr. Wilson's Computer**

On September 5, 2007, at least two FBI agents went to 2044 Sierra Road, apartment 4, in Concord, California, to question Danny Wilson. *See* FBI 302, attached as Exhibit A. According to agents, the address was Mr. Wilson's mother's home and Mr. Wilson's primary residence. *Id.* When Mr. Wilson opened the door, agents said they would like to talk to him. *Id.* Mr. Wilson stepped outside his apartment and sat on the steps leading to a neighboring apartment. *Id.*

Mr. Wilson made some statements, and FBI agent Dugan began to question him. *Id.* When it became noisy outside, an agent asked Mr. Wilson if there was somewhere more quiet that they could talk. *Id.* At that point, Mr. Wilson allowed the agents to enter his home. According to the agents, their weapons were not visible when they were talking to Mr. Wilson, and they told him that he was not under arrest and that he was free to leave. *Id.*

Mr. Wilson told the agents that he "exchanged pictures with girls who were under 18" and that he chatted in America Online ["AOL"] chat rooms with sexually explicit names. *Id.* He told the agents that he is interested in "younger single mothers[1] and people that are younger than him." *Id.* According to the agents, Mr. Wilson told them that he sometimes exchanged pictures with other people in AOL chat sessions. *Id.*

Mr. Wilson told the agents that "he has pictures saved on his computer but doesn't want to show" the agents. *Id.* He said that he had pictures on his computer of "'attractive' girls between the age of 16 and 35 years old" and that he had "received email with pre-teen pictures." *Id.* According to the agents, Mr. Wilson said that he chatted with people who may have been younger than 13. *Id.*

Mr. Wilson told the agents that he had sent three pictures, including one of an erect penis, to someone with the screen name of BlondeeBrit13. *Id.* He also told the agents that he sent three

---

[1]When asked why he was interested in single mothers Wilson responded that he did not want to have kids of his own. *Id.*

1   pictures of "young girls," including one that was naked and displaying her genitalia, to

2   BlondeeBrit13. *Id.* According to the agents, Mr. Wilson said that the naked girl was probably 10

3   years old.

4       At this point, FBI agent Dugan told Mr. Wilson that possession and transportation of

5   child pornography were federal crimes. *Id.* The agents "told Wilson that his computer was being

6   seized because Wilson stated that it had child pornography on it."[2] *Id.* The agents did not have a

7   warrant to seize or search Mr. Wilson's computer.

8       Mr. Wilson helped the agents disconnect the cables from the back of his computer. *Id.*

9   He signed a consent form to search his computer. *Id.* The agents left Mr. Wilson's apartment

10  with his computer. *Id.*

11  **B.    The Warrant Search of Mr. Wilson's Computer**

12      More than a month after the interview, on October 22, 2007, FBI agent Dugan applied for

13  and obtained a warrant to search the computer that he had seized, without a warrant, from Mr.

14  Wilson. *See* Search Warrant, attached as Exhibit B. The affidavit in support of the search

15  warrant alleges that there is probable cause to believe that on the computer is evidence of the

16  federal crimes of possession, receipt, distribution and transportation of child pornography. *See*

17  Affidavit, attached as Exhibit C, ¶ 1. It claims that on September 5, 2007, Mr. Wilson admitted

18  using the computer to receive and distribute minors engaged in sexually explicit conduct.

19  Exhibit C ¶ 2.

20      As a basis for finding probable cause for the search of Mr. Wilson's computer, the

21  affidavit alleges that Mr. Wilson had an on-line AOL chat with an undercover agent posing as a

22  minor on January 16, 2007. Exhibit C ¶ 19.a. Mr. Wilson then e-mailed pictures of himself and

23  of an erect penis to the undercover agent. Exhibit C ¶ 19.b. He allegedly told the undercover

24  agent via email "that he had pictures of kids engaging in sexual acts." *Id.* Mr. Wilson also sent

25  _____

26      [2]In fact, Mr. Wilson said no such thing. Exhibit A.

1    the undercover agent a picture of a minor girl holding a dildo, a picture of a minor girl "posed in

2    a sexually suggestive manner" and a picture of a "naked, minor female posed in a sexually

3    suggestive manner." *Id.* There is no indication that these pictures were shown to the magistrate

4    in support of the request for a warrant.

5         From a subpoena to AOL, agents determined that the subscriber associated with the AOL

6    screen name from which these e-mail were sent was "J. Wilson, located at 4021 Sacramento

7    Street" in Concord, California. Exhibit C ¶ 19.c. Agent Dugan apparently concluded "[t]hrough

8    database and other research," that J. Wilson was in fact Danny J. Wilson, who was living with

9    his mother at 2044 Sierra Road, apartment 4, in Concord. Exhibit C ¶ 20. The affidavit then

10   summarized the agents' interview of Mr. Wilson on September 5, 2007. Exhibit C ¶ 21.

11        According to the affidavit, Mr. Wilson admitted to "send[ing] and receiv[ing] images of

12   minors engaged in sexually explicit conduct." Exhibit C ¶ 21.a. Mr. Wilson also admitted

13   sending the three pictures of minor girls to the undercover agent on January 16, 2007. *Id.* He

14   told the agents that he used the computer at his home to access AOL and the Internet and that the

15   computer contained pictures he did not want to show the agents. Exhibit C ¶ 21.b. According to

16   the affidavit, Mr. Wilson said he had on the computer pictures he had received of "'attractive'

17   girls between the ages of 16 and 35" and that "he has received e-mails containing pictures of pre-

18   teens." *Id.* Mr. Wilson told the agents that he participated in chat rooms with sexually explicit

19   names. Exhibit C ¶ 21.c.

20        The affidavit stated that Mr. Wilson consented to a search of his computer. Exhibit C ¶

21   21.d. It does not state that the agents *seized* Mr. Wilson's computer without consent and without

22   a warrant.

23        The affidavit includes some general language about how data can remain on a computer

24   for a long period of time, even if the user has not deliberately saved, or has tried to delete, the

25   data. Exhibit C ¶¶ 11-12, 16.

26        Attached to the warrant, and incorporated into it by reference, Exhibit B, is this Court's

1   Protocol for Searching Devices or Media that Store Data Electronically ["Protocol"].  *See*

2   Protocol, attached as Exhibit D.  The Protocol states that in executing the warrant, the

3   government must first determine whether the search authorized by the warrant "reasonably can

4   be completed at the site within a reasonable time."  If it can, the government may seize the

5   computer "only if authorized by law because removal is (1) necessary to preserve evidence, or (2)

6   if the item is contraband, a forfeitable instrumentality of the crime, or fruit of crime."  Exhibit D

7   at 1.  If the search cannot be completed on site with a reasonable time, the government must

8   determine whether it can accomplish the authorized search by duplicating the computer and

9   completing the search off site.  *Id.*  "The government may remove from the search location a

10  device only if the device cannot be searched reasonably on site, or by mirror-imaging or

11  otherwise duplicating its contents for off site examination -- unless authorized by law to remove

12  the decide because (1) removing the device is necessary to preserve evidence, or (2) the device is

13  contraband, a forfeitable instrumentality of the crime, or fruit of crime."  Exhibit D at 1-2.  If the

14  government removes the computer to complete the search off site, it must file a return with the

15  magistrate within 10 days.  Exhibit D at 2.  "The government must complete an off-site search of

16  a device that agents removed in order to search for evidence of crime as promptly as practicable

17  and no later than 30 calendar days after the initial execution of the warrant."  *Id.*

18  **C.**    **Execution of the Warrant Search of Mr. Wilson's Computer**

19          The search warrant in this case was issued on October 22, 2007.  Exhibit B.  It required

20  that the search be conducted "on or before October 31, 2007."  *Id.*  According to the discovery,

21  Mr. Wilson's computer was submitted to the computer forensic laboratory for analysis on

22  October 25, 2007.  *See* FBI 302, attached as Exhibit E.  The laboratory made a copy of the

23  contents of Mr. Wilson's computer on November 7, 2007, *see* Imaging Report, attached as

24  Exhibit F, and prepared a final report of the search of Mr. Wilson's computer on November 21,

25

26

1   2007.[3]  *See* Final Examination Report, attached as Exhibit G.  More than a month later, on

2   November 30, 2007, agents received from the laboratory a disk containing files from Mr.

3   Wilson's computer.  Exhibit E.  An agent apparently reviewed the files on the disk at some point

4   between November 30, 2007, and December 27, 2007.  *Id.*

5   **D.      The Warrant to Obtain the Contents of the AOL E-Mail Account**

6          On October 22, 2007, Agent Dugan obtained a warrant directing AOL to search and copy

7   records relating to, evidence of child pornography offenses in, and e-mail messages to or from an

8   e-mail address, eyemkinkyru2@aol.com.  Search Warrant, attached as Exhibit H.  According to

9   the affidavit, the account associated with this e-mail address "is believed to belong to" Mr.

10  Wilson.[4]  Attachments and Affidavit in Support of Search Warrant, attached as Exhibit I, ¶ 2.  A

11  subpoena for subscriber information previously served on AOL revealed that a J. Wilson, in

12  Concord, California, was the subscriber for that e-mail address.  Exhibit I ¶ 17.c.  The affiant

13  claims to have determined that J. Wilson was in fact Danny J. Wilson, who was living with his

14  mother at a different address in Concord.  Exhibit I ¶ 18.

15         This affidavit includes the essentially the same information as the affidavit discussed

16  above about Mr. Wilson admitting to"send[ing] and receiv[ing] images of minors engaged in

17  sexually explicit conduct," and admitting to sending the three pictures of minor girls to the

18  undercover agent on January 16, 2007.  Exhibit I ¶¶ 17, 19.  The affidavit alleges that Mr. Wilson

19  received pictures of "'attractive' girls between the ages of 16 and 35," that "he has received e-

20  mails containing pictures of pre-teens," and that he typically requested pictures from and sent

21  _____

22         [3]According to the forensic report, "[t]here were no relevant e-mail messages, or chat logs"
     on Mr. Wilson's computer.  Exhibit G.

23
         [4]According to the affidavit, Mr. Wilson told the agents during the September 5, 2007,
24  interview that "he uses the AOL screen names 'Eyemkinkyru2' and 'Jconc7'."  Exhibit I ¶ 19.a.
     In fact, the report of that interview says nothing about "Jconc7."  Exhibit A.  Moreover, Mr.
25  Wilson said during that interview only that he "was familiar with the screen name
     'Eyemkinkyru2,'" and that he had sent the email with pictures to the agent that was sent from
26  that screen name.  *Id.*

1  pictures of himself to people with whom he would have one-on-one chats in chat rooms with

2  sexually explicit names.  Exhibit I ¶ 19.

3          The affidavit also includes background information about Internet service providers

4  ["ISPs"], such as AOL, e-mail and AOL.  Exhibit I ¶¶ 10-15.  According to the affidavit, e-mail

5  ISPs keep electronic records, including "e-mail transaction information."  Exhibit I ¶ 14.b.  The

6  affidavit included information about ISPs' storage of e-mail received and sent by subscribers:

7          d.      Any e-mail that is sent to a subscriber is stored in the
                subscriber's "mailbox" on the ISP's servers *until the subscriber*
8              *deletes the e-mail or the subscriber's mailbox exceeds the storage*
                *limits preset by the e-mail ISP.  If the message is not deleted by the*
9              *subscriber, the account is below the maximum limit, and the*
                *subscriber accesses the account periodically, that message can*
10             *remain on the ISP's servers indefinitely;*

11         e.      When the subscriber sends an e-mail, it is initiated at the
                user's computer, transferred via the Internet to the e-mail ISP's
12             servers, and then transmitted to its end destination.  *ISP users have*
                *the option of saving a copy of the e-mail sent.  Unless the sender of*
13             *the e-mail specifically deletes the e-mail from the ISP server, the e-*
                *mail can remain on the system indefinitely.  The sender can delete*
14             *the stored e-mail message thereby eliminating it from the e-mail*
                *box maintained at the e-mail ISP*, but that message will remain in
15             the recipient's e-mail box unless the recipient deletes it or unless
                the recipient's account is subject to account size limitations.
16
   Exhibit I ¶ 14 (emphasis added).
17
           According to AOL, unread and sent mail is retained for approximately 28 days.  *See*
18
   Current AOL Retention Periods, attached as Exhibit J.  Read mail is retained for approximately 2
19
   days.  *Id.*  Signficantly, this information was not included in the search warrant affidavit.
20
           The warrant was served on AOL on October 23, 2007.  In response, AOL provided the
21
   agent with a CD-ROM.  To date, the government has not disclosed the CD-ROM to Mr. Wilson.
22
                                  **ARGUMENT**
23
   A.      **The Warrantless Seizure Of Mr. Wilson's Computer Violated The Fourth**
24             **Amendment**

25         The Fourth Amendment protects not only against unreasonable searches but also against

26  unreasonable seizures, including seizures of "papers, and effects."  U.S. Const. amend. IV.  At

1  issue in a search is an individual's privacy interests; a seizure, by contrast, implicates possessory

2  interests. *Soldal v. Cook County*, 506 U.S. 56, 61 (1992). But as the Supreme Court has stated,

3  "our cases unmistakably hold that the [Fourth] Amendment protects property as well as privacy."

4  *Id.* at 62.

5      Law enforcement officers must have legal justification to seize an object, even where no

6  search occurs. *Id.* at 68. "As the Supreme Court has emphasized, the mere fact that some objects

7  are lawfully discovered by an officer within premises does not provide a legal basis for the

8  seizure of those objects." 3 Wayne R. LaFave, *Search and Seizure* § 6.7(a) (2004) (footnote

9  omitted). "It is per se unreasonable to make a seizure without a warrant absent certain restrictive

10  exceptions." *G&G Jewelry, Inc. v. City of Oakland*, 989 F.2d 1083, 1099 (9th Cir. 1993); *see*

11  *also United States v. Place*, 462 U.S. 696 (1983) (authorizing warrantless seizures, with probable

12  cause, only "if the exigencies of the circumstances demand it or some other recognized exception

13  to the warrant requirement is present."). The government bears the burden of establishing that a

14  warrantless seizure does not violate the Fourth Amendment. *United States v. Delgadillo-*

15  *Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988).

16      The agents here seized Mr. Wilson's computer without a warrant. This warrantless

17  seizure was particularly egregious because it involved a computer; as the Ninth Circuit has

18  recognized, computers may not only contain evidence of crimes, but they also "can be

19  repositories of innocent and deeply personal information." *United States v. Adjani*, 452 F.3d

20  1140, 1152 (9th Cir. 2006). Especially when the government is dealing with computers, in which

21  evidentiary and/or contraband files may be intermingled with many files that are private and non-

22  incriminating, it must remain mindful of what, if anything, it has authority to seize. "We do not

23  hold that the government enjoys a right to "wholesale" seizure of evidence without judicial

24  authorization; indeed, our decision stands for the opposite." *United States v. Comprehensive*

25  *Drug Testing, Inc.*, 513 F.3d 1085, 1113 n.50 (9th Cir. 2008); *see also United States v. Tamura*,

26  694 F.2d 591, 595 (9th Cir. 1982) ("the wholesale *seizure* for later detailed examination of

1   records not described in a warrant is significantly more intrusive [than inspecting files on the

2   scene] and has been characterized as the kind of investigatory dragnet that the fourth amendment

3   was designed to prevent." (quotation marks omitted; emphasis in original)).

4         The government cannot establish that the warrantless seizure of Mr. Wilson's computer

5   did not violate the Fourth Amendment.  All fruits of the warrantless seizure must be suppressed.

6   **B.    The Unreasonably Long Detention Of Mr. Wilson's Computer Violated The
         Fourth Amendment**

7         A warrantless seizure, even if supported by probable cause and exigent circumstances,

8   will violate the Fourth Amendment if it is unreasonable in duration.  *United States v. Place*, 462

9   U.S. 696 (1983); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998); *United States v.*

10  *Repress*, 9 F.3d 483, 488 (6th Cir. 1993); *United States v. Tamura*, 694 F.2d 591, 597 (9th Cir.

11  1982).  After the agents here seized Mr. Wilson's computer without a warrant, they held the

12  computer for more than a month and a half before they obtained a search warrant.  *See* Exhibit A

13  (warrantless seizure on September 5, 2007), Exhibit B (search warrant issued on October 22,

14  2007).  This is an unreasonable period of time for the agents to detain a computer, seized without

15  a warrant, before getting a search warrant.  *Cf. United States v. Hall*, 142 F.3d 988, 994-95 (7th

16  Cir. 1998) (holding that one-day detention of computer, at repair shop, before issuance of

17  warrant, to allow police to make arrangements for expert to view child pornography on computer,

18  was not unreasonable); *cf. also Martin*, 157 F.3d at 54 (noting that generally police should be

19  able to get warrant in less time than 11 days it took them in this case but finding, on the facts,

20  that delay was not unreasonable); *Repress*, 9 F.3d at 488 (finding 10-hour delay between seizure

21  of suitcase and issuance of warrant not unreasonable).

22        The government cannot carry its burden of establishing that the agents' detention of Mr.

23  Wilson's computer, which they had seized without a warrant, was of reasonable duration.

24  Because the detention was unreasonable, the seizure violated the Fourth Amendment.  All fruits

25  of the unlawful seizure must be suppressed.

26

1    **C.    The Warrant Affidavit Did Not Establish Probable Cause**

2        The Fourth Amendment protects people from unreasonable searches of their "persons,

3    houses, papers, and effects." U.S. Const. amend. IV.  Under the Fourth Amendment, police

4    generally must obtain a warrant, supported by probable cause, before they may search and seize

5    evidence.  *Id.*  Specifically, the Fourth Amendment "requires the government to establish by

6    sworn evidence presented to a magistrate that probable cause exists to believe that an offense has

7    been committed and that items related to that offense . . . will be found on the premises sought to

8    be searched at the time the warrant is issued." *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir.

9    1988); *see Illinois v. Gates*, 462 U.S. 213, 238 (1983).

10        Probable cause to search is determined by the totality of the circumstances. *Gates*, 462

11    U.S. at 230-31.  The court considers whether there is "a substantial basis for concluding that the

12    affidavit in support of the warrant established probable cause." *United States v. Greany*, 929

13    F.2d 523, 524 (9th Cir. 1991).  "[C]ommon rumor or report, suspicion, or even 'strong reason to

14    suspect,'" are not sufficient to establish probable cause. *Henry v. United States*, 361 U.S. 98,

15    101 (1959).  Moreover, "a federal search warrant must be based upon a showing of probable

16    cause that a federal crime has been committed and that evidence of that crime is present on the

17    premises to be searched." *United States v. Washington*, 797 F.2d 1461, 1473 (9th Cir. 1986).

18        The affidavit in support of the warrant here does not establish probable cause to believe

19    that Mr. Wilson committed the alleged offenses of possession, receipt and distribution of child

20    pornography or that evidence of such offense would be found in his computer.  *See* Exhibit C ¶ 1

21    (identifying offenses).  The only evidence in the affidavit that Mr. Wilson committed these

22    offenses is his alleged statement to agents, on September 5, 2007, "that he uses AOL . . . to send

23    and receive images of minors engaged in sexually explicit conduct" and admission that on

24    January 16, 2007, he sent via email pictures of "three minor girls engaging in sexual acts,

25    including:  one photo of a minor girl holding a dildo; one photo of a minor girl posed in a

26    sexually suggestive manner on a chair, focusing on her underwear and genitalia or pubic area

1    beneath her skirt; and one photo of a naked, minor female posed in a sexually suggestive manner,

2    focusing on her genitalia or pubic area." Exhibit C ¶¶ 19.b, 21.a.

3        More importantly, the affidavit does not establish probable cause to believe that evidence

4    or contraband would be found on Mr. Wilson's computer in October 2007 based on his allegedly

5    sending the three e-mailed photographs more than ten months earlier.

6        First, there is no probable cause to believe that evidence or contraband would be found on

7    Mr. Wilson's computer at the time the warrant issued. Although the affidavit alleges that Mr.

8    Wilson told the agent "that he used the subject computer located at his residence to access AOL

9    and the Internet" and that it was the only computer at the residence,[5] Exhibit C ¶ 21.b, there is no

10   evidence in the affidavit that Mr. Wilson used this computer when he sent the three pictures in

11   January 2007. *Cf. United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (finding that facts in

12   affidavit supported conclusion that images defendant downloaded to computer would be present

13   in apartment at time of search ten months later). The affidavit also does not include facts to

14   support a finding that, even if it were the same computer, the pictures would remain on the

15   computer more than ten months after they were sent.

16       Second, the affidavit does not establish probable cause to believe that these pictures are

17   child pornography. The affidavit includes the statutory definition of "sexually explicit conduct,"

18   which is incorporated in the offenses that Mr. Wilson is alleged to have committed. Exhibit C ¶¶

19   1, 9. However, the affidavit does not state that the pictures were of minors engaged in sexually

20   explicit conduct. Exhibit 19.b. Nor do the descriptions of the pictures in the affidavit establish

21   that they were depictions of minors engaged in "sexually explicit conduct" within the statutory

22   definition. *Id.*; *see United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006) ("[N]ot all images of

23   nude children are pornographic."). The affidavit did not include copies of the pictures, *cf. Hill*,

24   459 F.3d at 969 n.4 (noting that it is preferable for affiant to include copies of pictures), and the

25   _____

26       [5]The FBI report of the September 5, 2007, interview of Mr. Wilson does not include any
     statement that the computer the agents seized was the only computer at the residence. Exhibit A.

1  descriptions of the pictures in the affidavit are not particularly detailed. *Cf. id.* at 972-73 (finding

2  probable cause where affidavit described images in detail).

3        The affidavit in this case does not establish probable cause to believe either (1) that

4  contraband or evidence would be found in Mr. Wilson's computer when the warrant issued, or

5  (2) that Mr. Wilson committed the federal crimes identified in the affidavit. Accordingly, the

6  search of Mr. Wilson's computer pursuant to the warrant violated the Fourth Amendment. All

7  fruits of the search of Mr. Wilson's computer must be suppressed.

8  **D.     The Warrant Affidavit Included Material Misstatements And Omitted**
   **Material Information, Without Which It Would Not Have Established**
9  **Probable Cause**

10        In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court recognized the

11  constitutional right to challenge the truthfulness of statements contained in a search warrant

12  affidavit. A district court must hold an evidentiary hearing under *Franks* upon a substantial

13  preliminary showing that (1) a false statement was included in the affidavit; (2) the false

14  statement was made knowingly and intentionally, or with reckless disregard for the truth; and (3)

15  the allegedly false statement was necessary to the finding of probable cause. *Franks*, 438 U.S. at

16  155-56; *see also Belmontes v. Brown*, 414 F.3d 1094, 1122 (9th Cir. 2005) (noting that *Franks*

17  hearing also is required for reckless omissions). At this stage, clear proof of deliberate or

18  reckless misstatements or omissions is not required; rather, it is reserved for the evidentiary

19  hearing. *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985); *United States v. Chesher*,

20  678 F.2d 1353, 1362 (9th Cir. 1982). At the evidentiary hearing, if the defendant ultimately

21  establishes the required elements by a preponderance of the evidence, the court must void the

22  search and suppress the fruits thereof. *Franks*, 438 U.S. at 156.

23        The affidavit here includes two material false statements and omissions. First, according

24  to the affidavit, Mr. Wilson said during the September 5, 2007, interview that "he uses AOL . . .

25  to send and receive images of minors engaged in sexually explicit conduct." Exhibit C ¶ 19.b.

26  But the affiant's report of this interview does not include such a statement from Mr. Wilson.

1    Exhibit A.

2         According to the report, Mr. Wilson told the agents that he exchanged pictures with

3    minors, that he would ask to exchange pictures with people in chat rooms, that he "has received

4    [and has on his computer] pictures of 'attractive' girls between the age of 16 and 35 years old"

5    and that he "has received email with pre-teen pictures." Exhibit A. None of these statements

6    describes sending and receiving images of minors engaged in sexually explicit conduct. This is

7    particularly true in light of his statements during the interview, which were not included in the

8    affidavit, that he "has an interest in younger single mothers" and that the only person he chatted

9    with on-line whom he met in person was a 25-year-old transgendered person. *Id.*

10        Mr. Wilson also acknowledged sending the three pictures to the agent posing as

11   BlondeeBrit13 on January 16, 2007. This is the only statement he made during the September 5,

12   2007, interview about sending or receiving pictures that possibly could be described as "minors

13   engaging in sexually explicit conduct." The affidavit thus misrepresented that Mr. Wilson

14   admitted to agents using "AOL . . . to send and receive images of minors engaged in sexually

15   explicit conduct."

16        Second, the affidavit omitted the fact that the agents seized Mr. Wilson's computer

17   without a warrant and detained it for a month and a half before seeking a warrant to search it.

18   Had the magistrate known these facts, he might have questioned the constitutionality of the

19   seizure and detention, as discussed above. Knowing that agents violated Mr. Wilson's Fourth

20   Amendment rights in seizing his computer, the magistrate would not have issued the warrant.

21        Particularly in light of the weak nature of the probable cause statement in the affidavit,

22   without these material omissions and misrepresentation in the affidavit, it would not have

23   established probable cause for the search of Mr. Wilson's computer. Because the affiant knew or

24   at least should have known each of these facts before he prepared the affidavit, he had at least a

25   reckless disregard for the truth. If the Court finds that the affidavit in support of the search

26   warrant does establish probable cause to search the computer, it must grant a *Franks* hearing.

E.    **The Warrant Was Not Executed Within The Time Specified**

Rule 41 of the Federal Rules of Criminal Procedure requires that federal search warrants command agents to "execute the warrant within a specified time no longer than 10 days." Fed. R. Crim. P. 41(e)(2)(A)(i).  This ten-day period is the maximum period under the rule for executing a warrant.  *United States v. Nepstead*, 424 F.2d 269, 271 (9th Cir. 1970).  A search warrant that is not executed within ten days is void.  *Sgro v. United States*, 287 U.S. 206, 210-12 (1932).

The warrant in this case required that the search of Mr. Wilson's computer be conducted "on or before October 31, 2007."  Exhibit B.  According to the discovery, Mr. Wilson's computer was submitted to a forensic laboratory for analysis on October 25, 2007.[6]  Exhibit E.  The laboratory began its search of Mr. Wilson's computer no earlier than November 7, 2007, Exhibit F, and completed its search on or before November 21, 2007.  Exhibit G.  A month later, on November 30, 2007, an FBI agent received from the laboratory a disk with files from Mr. Wilson's computer, and some time before December 27, 2007, examined those files.  *Id.*

The search warrant by its terms, and consistent with Rule 41, required that the search of Mr. Wilson's computer be conducted no later than October 31, 2007.  The evidence submitted herewith establishes that Mr. Wilson's computer was not searched within the time specified by the warrant.  The warrant thus did not authorize the search, which, in the absence of an authorizing warrant, was unconstitutional.  All fruits of the unauthorized search of Mr. Wilson's computer must be suppressed.

---

[6]There is in the discovery a search warrant return indicating that the date and time the warrant was "executed" was October 25, 2007, at 2:46 p.m.  *See* Return, attached as Exhibit H; *see* Fed. R. Crim. P. 41(f)(1)(A) (requiring officer who executes warrant to enter on warrant exact date and time it was executed).  According to the discovery, however, this is the date that Mr. Wilson's computer was taken to the laboratory.  Exhibit E.  What the warrant authorized was not the taking or movement of Mr. Wilson's computer but the *search* of the computer for evidence related to child pornography.  Exhibit B.  The reports from the forensic laboratory indicate that the *search* took place in November 2007, weeks after the ten-day time limit specified in the warrant.  Exhibits F, G.

F.    **The Affidavit Did Not Establish Probable Cause For The AOL Warrant**

The affidavit does not establish probable cause to believe that evidence or contraband would be found in the AOL account in October 2007. According to the affidavit, e-mail sent to a subscriber "can remain on the ISP's servers indefinitely" only if the subscriber neither "exceeds the storage limit preset by the e-mail ISP" nor deletes the e-mail. Exhibit I ¶ 14.d. E-mail sent from a subscriber does not remain on the ISP's servers at all, according to the affidavit, unless the ISP user chooses to save a copy of the e-mail sent. Exhibit I ¶ 14.e. If the user chooses to save a copy of a sent e-mail, it "can remain on the system indefinitely" only if the user then chooses not to delete the stored e-mail message. *Id.*

The affidavit thus sets forth very limited circumstances in which a subscriber's incoming or outgoing e-mail message would be stored on AOL's servers. This fact, plus the fact that the only e-mail of minors engaging in sexual acts that the affidavit identifies as having been sent from or received by the Emeykinkyru2 account was sent in January 16, 2007, renders it very unlikely that evidence or contraband would be found in the e-mail account in October 2007. Moreover, the agents had seized Mr. Wilson's computer a month and a half before the search warrant issued, making it even less likely that any messages he sent, at least, would remain in his AOL account. Accordingly, the affidavit did not establish probable cause for the warrant to obtain the AOL account information.

G.    **The AOL Warrant Affidavit Included Material Misstatements And Omitted Material Information, Without Which It Would Not Have Established Probable Cause**

The AOL affidavit includes the same material misstatement discussed in section D., above. In addition, this affidavit also omits material information about AOL's policies of retaining e-mail. According to AOL, it currently retains unread and sent mail for approximately 28 days. Exhibit J. It currently retains read mail for approximately two days. *Id.* The very short retention periods make it even less likely that evidence or contraband probably would be found in the AOL account at the time the warrant issued. Had the affiant presented this information to the

1  magistrate, the magistrate would not have found probable cause to issue the warrant.

2                                              **CONCLUSION**

3          For the reasons stated above, the Court should suppress all fruits of the unlawful seizure

4  and search of Mr. Wilson's computer.  Agents seized Mr. Wilson's computer from his home

5  without a warrant.  They detained his computer without seeking or obtaining judicial approval for

6  more than a month and a half.  The warrant they obtained to search his computer was not

7  supported by probable cause, and the affidavit in support of the warrant contained material

8  misstatements and omissions, without which it would not have established probable cause.  The

9  agents did not execute the search warrant within the time specified.  The Court must suppress all

10  fruits of the unlawful seizure and search of Mr. Wilson's computer or, at least, conduct a *Franks*

11  hearing.

12  Dated: August 12, 2008

13                                        Respectfully submitted,

14                                        BARRY J. PORTMAN
                                          Federal Public Defender
15
                                                  /S/
16
                                          JOYCE LEAVITT
17                                        Assistant Federal Public Defender

18

19

20

21

22

23

24

25

26

# EXHIBIT   A

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    09/05/2007

      DANNY J. WILSON residing at 2044 Sierra Road, Apartment number 4, Concord, California, home telephone number 925-827-4413, cellular telephone number 925-305-9649 was interviewed at Joann Wilson's (Danny Wilson's mother) residence.  WILSON considers this his primary residence.  At approximately 11:00 AM, Special Agents (SA) Dugan and Frank knocked on the front door of 2044 Sierra Road, Apartment number 4, and no one answered the door.  SA Dugan called 925-827-4413, no one answered and SA Dugan left a message requesting that Danny Wilson contact the FBI.  SA Dugan left his contact information on the answering machine.  SA Dugan then began calling 925-305-9649 when WILSON opened the door.  After being advised of the identities of the interviewing Agents and the nature of the interview, WILSON provided the following information:

      SA Dugan said we would like to speak with WILSON.  WILSON agreed and stepped outside and sat on the steps leading to the adjacent apartment.  WILSON began speaking first and said he needed to stop chatting online and he should let fantasies end online. WILSON said he had never gone to meet anyone and that he thought you could only get in trouble if you go and meet someone in person like on the television show To Catch a Predator.

      SA Dugan asked WILSON if he was familiar with the screen name "Eyemkinkyru2".  WILSON said yes.  SA Dugan started to ask another question when a landscaping crew working on the lawn near WILSON'S apartment turned on their equipment which made it difficult to hear.  SA Dugan asked WILSON if there was somewhere more quiet to talk.  WILSON said we could go into his house and allowed agents to enter his house.  WILSON asked if he was under arrest.  SA Dugan said he was not under arrest and that this was a voluntary interview and he was free to go at any time.  WILSON was not handcuffed nor were the Agents's weapons visible at any time. SA Dugan's shirt covered his weapon and SA Frank's vest covered his weapon.  WILSON was free to move about the apartment during the interview.

      WILSON stated he exchanged pictures with girls who were under 18.  WILSON uses a Mac computer which is missing a case and the drives do not work.  WILSON chats in user created chat rooms on AOL.  These chat rooms have sexually explicit names.  WILSON began

| Investigation on | 09/05/2007 | at | Concord, California |
|---|---|---|---|

| File # | ████████████ | | Date dictated | Not dictated |
|---|---|---|---|---|
| | SA S. Cort Dugan | | | |
| by | SA Hans H. Frank | | | |

DJW-009

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    <u>Danny Wilson</u>                              , On <u>09/05/2007</u> , Page    <u>2</u>

chatting in chat rooms about three years ago and has been a member of AOL for about 10 years.

WILSON stated in a question why does AOL allow people to have tempting things on the internet? WILSON stated he was a curious person. WILSON said people don't always tell the truth online.

WILSON stated he joined AOL to broaden his social life. WILSON has an interest in younger single mothers and people that are younger than him. When asked why WILSON was interested in single mothers WILSON stated that he did not want to have kids of his own.

WILSON visits chat rooms and then may chat with people one on one. WILSON typically asks for people's age, sex and location. This question is commonly abbreviated ASL. WILSON would ask for someone's ASL before chatting with them. WILSON would also typically ask for "self pictures" which would be exchanged via email. In some cases, the person WILSON was chatting with would require that WILSON "send to receive" meaning that in order for WILSON to get a picture of the other person WILSON would need to send a picture first. WILSON would email pictures of himself to the other person and address it to the screen name in the AOL chat session. The address WILSON would send the pictures to would be screen name plus @aol.com. Before sending pictures WILSON would ask the rating of the picture to be sent. The ratings are G for torso picture with clothes on; R for girl with panties and bra; and X for naked pictures. Sometimes WILSON would send to receive to another person but no get any pictures in return. Chat sessions might progress to "cyber chat" which is cyber sex - a one to one chat session where people chat about what two people would do if there were together physically.

WILSON stated he has pictures saved on his computer but doesn't want to show us (SAs Dugan and Frank). WILSON stated he has received pictures of "attractive" girls between the age of 16 and 35 years old; these pictures are on his computer. WILSON has received email with pre-teen pictures. WILSON said he has chatted and exchanged pictures of people from other places like the east coast, LA and San Francisco. WILSON stated he chatted with people possibly under the age of 13.

WILSON stated when he was 28 years old he chatted with someone online and was given the name and address of the person who

DJW-010

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Danny Wilson_____ , On _09/05/2007_ , Page ___3___

     lived in Oakland.  The person WILSON went to meet with was a pre
operation transgender (male to female) approximately 25 years of
age.  WILSON exchanged pictures online and went to met this person
at their home in Oakland near Lake Merritt.  WILSON stated the
individual had a chest but with all the plumbing.  WILSON only meet
this person once.  WILSON stated he never meet anyone in person
from an online chat besides the person in Oakland.

     WHEN asked about the ages of the people in the pictures
on his computer WILSON initially stated 16 years of age.  WILSON
stated all inappropriate pictures were from other AOL users.

     SA Dugan told WILSON that he was going to show WILSON
some pictures.  WILSON was shown a picture of WILSON sitting on the
floor fully clothed.  When asked if this picture was of him WILSON
responded affirmatively.  SA Dugan then showed WILSON a picture of
WILSON with his shirt off and WILSON again responded affirmatively
that this was a picture of him.  WILSON was then shown a picture of
an erect penis and asked if this was a picture of him and WILSON
stated it was not a picture of him but he did send it to people and
said it was him.  WILSON was then shown a print out of the email
with the above described pictures dated 1/16/2007.  This email
print out has a subject of "here u go" and is from Eyemkinkyru2 to
BlondeeBrit13.

     WILSON was shown a print out of an email sent from
Eyemkinkyru2 (WILSON'S AOL screen name) to BlondeeBrit13 dated
January 16, 2007 which included three pictures of young girls sent
15 minutes after the previously described email.  Two of the girls
are clothed and one is naked and displaying her genitalia.  When
asked how old the naked girl was WILSON initially said younger than
12 years.  When asked to be more specific and shown a larger
printout of the same picture WILSON  said probably 10 years old.
When asked if WILSON sent this email WILSON responded
affirmatively.

     SA Dugan stated that possession and transportation of
child pornography was illegal and a federal violation.  SA Dugan
told WILSON that his computer was being seized because WILSON
stated it had child pornography on it.

     WILSON asked when he was going to be arrested.  WILSON
asked how much time he had before he was going to be arrested.  SA
Dugan stated that Agents investigate and the AUSA prosecutes.

DJW-011

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Danny Wilson_____, On 09/05/2007 , Page ___4___

     WILSON assisted in disconnecting the cables from the back of his computer. WILSON then signed the receipt of property for his computer. SA Dugan asked WILSON to sign a consent form to allow Law Enforcement agents to assume his online identity. WILSON did not sign the form. When asked to sign the Consent to Search his computer form WILSON did. SA Dugan advised WILSON not to destroy any evidence and that lying to a Federal agent was a crime.

     At approximately 12:15 PM Agents provided WILSON with the receipt of property for WILSON'S computer and then departed the residence.

     Note: At approximately 3:05 PM on September 5, 2007, WILSON called SA Dugan's cellular phone and stated he would like to give permission to have agents assume his online identity. SA Dugan stated he would call WILSON Friday morning to schedule a time to have WILSON sign the consent form. WILSON also advised that there would not be much time to assume his identity as his AOL account will terminate on September 21st.

DJW-012

# EXHIBIT   B

AO 93    (Rev. 12/03) Search Warrant

# UNITED STATES DISTRICT COURT

Northern      District of    California

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

Apple tower computer marked as part number
620-1100-8AC and bar code JK7274964TQA and the
Iomega Zip 100 drive with a Zip disk located inside.

**SEARCH WARRANT**



4 - 0 7 - 7 0 6 1 4

Case Number:

TO:   FBI Special Agent S. Cort Dugan      and any Authorized Officer of the United States

Affidavit(s) having been made before me by   FBI Special Agent S. Cort Dugan     who has reason to believe
                 Affiant

that     on the person of, or   ✔ on the premises known as (name, description and/or location)
Apple tower computer marked as part number 620-1100-8AC and bar code JK7274964TQA and the Iomega Zip 100
drive with a Zip disk located inside.  The computer is currently located in the Evidence Room at the FBI Oakland
Resident Agency, 180 Grand Avenue, Oakland, California.

in the   Northern         District of   California         there is now
concealed a certain person or property, namely (describe the person or property)

See Attachments A, B + C.

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described
is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before   10/31/2007
                                                      Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the
search   ✔ in the daytime — 6:00 AM to 10:00 P.M.    | at anytime in the day or night as I find reasonable cause has been
established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person
or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to
Edward M. Chen                                   as required by law.
            U.S. Magistrate Judge  (Rule 41(f)(4))

10/22/07 @ 2:30 pm         at   San Francisco, California
Date and Time Issued                            City and State

Magistrate Judge Edward M. Chen
Name and Title of Judge                            Signature of Judge

DJW-0165

## ATTACHMENT A

## Location To Be Searched

Apple tower computer (missing front and top cover) with no serial number (there is a label with part number 620-1100-8AC and bar code JK7274964TQA on the front of the computer), as well as the Iomega Zip 100 drive with a Zip disk located inside (both of which were located in the computer when it was seized).  The computer is currently located in the Evidence Room at the FBI Oakland Resident Agency, 180 Grand Avenue, Oakland, California.

## ATTACHMENT B

### Items To Be Searched For And Seized

All records, documents, and materials regarding or pertaining to:

1.   Any depictions of a sexual nature involving individuals under the age of 18.

2.   Any depictions of genitalia of individuals under the age of 18.

3.   Any depictions involving sexual acts with individuals under the age of 18.

4.   Any child erotica.

5.   Documents or correspondence pertaining to the possession, receipt, transportation or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, including, but not limited to, letters, electronic mail, chat logs, and electronic messages.

6.   Books, ledgers, and records bearing on shipment, orders, requests, trading, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce, including by United States mail or by computer, of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

7.   Credit card information specifically related to the purchase, installation, or maintenance of an Internet or e-mail account including, but not limited to, bills, sales receipts and payment records; and records or other items which evidence ownership or use of the computer equipment referenced in Attachment A.

# EXHIBIT   C

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, S. Cort Dugan, being first duly sworn, hereby depose and state as follows:

## A. INTRODUCTION

1.     I make this affidavit in support of an application for a warrant to search an Apple tower computer ("SUBJECT COMPUTER"), which is further described below and in Attachment A. The SUBJECT COMPUTER is in the government's possession. As set forth herein, there is probable cause to believe that on the SUBJECT COMPUTER, there exists evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(4)(B) and 2252A(a)(5)(B), which make it a crime to posses child pornography; violations of 18 U.S.C. §§ 2252(a)(2) and 2252A(a)(2), which make it a crime to receive or distribute child pornography in interstate commerce; and violations of 18 U.S.C. §§ 2252(a)(1) and 2252A(a)(1), which make it a crime to transport, ship, or mail child pornography in interstate commerce.

2.     The SUBJECT COMPUTER belongs to Danny J. Wilson ("WILSON"). In sum, the investigation involves WILSON's receipt and distribution of images of minors engaged in sexually explicit conduct using the SUBJECT COMPUTER. On September 5, 2007, WILSON admitted to using the SUBJECT COMPUTER for these purposes.

3.     Because this affidavit is being submitted for the limited purpose of securing a search warrant for the SUBJECT COMPUTER, I have set forth only the facts that I believe are necessary to establish probable cause to believe that fruits, evidence, and instrumentalities of violations of federal law will be located in the SUBJECT COMPUTER.

-1-

### B.  AGENT BACKGROUND

4.      I have been employed by the FBI since January 2005.  I am currently located in

the Oakland Resident Agency of the San Francisco Division.  I am assigned to the San Francisco

Criminal Cyber Squad, which investigates crimes involving computer intrusions, sexual

exploitation of minors, including such exploitation via the Internet and computers, and other

computer-related violations.

5.      In my capacity as a Special Agent, I investigate a variety of violations of federal

law, including possession and distribution of child pornography and the sexual exploitation of

children.  During the investigation of these cases, I have participated in the execution of search

and arrest warrants, and have seized evidence of violations of United States law.  I have

interviewed witnesses and have read official reports of similar interviews by other investigators.

As a Special Agent, I am authorized to investigate crimes involving the sexual exploitation of

children via the use of the Internet and/or child pornography, and I am a law enforcement officer

with authority to execute arrest and search warrants under the authority of the United States.

6.      The statements and conclusions set forth in this affidavit are based upon the facts

related in this affidavit, which I learned from my personal investigation or from other

investigators in this case.  Also, the statements and conclusions in this affidavit are based on my

training and experience and on information relayed to me by other federal, state and local law

enforcement officers.

### C.  DEFINITIONS

7.      The term "minor" as used herein is defined in Section 2256(1) of Title 18 of the

United States Code as any person under the age of eighteen years.

DJW-0174

8.    The term "visual depiction" as used herein is defined in Section 2256(5) of Title 18 of the United States Code to include "undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversation into a visual image."

9.    The term "sexually explicit conduct" as used herein is defined in Section 2256(2) of Title 18 of the United States Code as "actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person."

10.    The term "computer" as used herein, is defined pursuant to Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

## D. BACKGROUND REGARDING COMPUTERS AND CHILD PORNOGRAPHY

11.    Based upon my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge that data that is processed by a computer may be written to the computer hard drive or other storage medium even if the user does not intentionally save the information.  For example, a computer operating system may take random data out of working memory and use it to "pad" files on a computer hard drive during the storage process.

12.    Based upon my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge that electronic information can remain on computer storage media, such as hard drives, for an indefinite period of time.  Even when a computer user

-3-

attempts to delete records from a computer storage medium, the records may still exist and be recovered through computer forensic techniques.

13.     Based upon my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge that computer files may be easily moved from computer to computer, using direct wire or wireless connections or through the use of storage media such as floppy diskettes, CDs, and USB drives. Copies of files moved in such a fashion can exist on multiple computers or storage devices at the same time.

14.     Based upon my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge that the ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution of child pornography. This pornography can be electronically mailed to anyone with access to a computer and modem. With proliferation of commercial services and chat services, the computer has become one, if not the preferred, method of distribution of pornographic materials.

15.     Based upon my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge that the computer's ability to store images in digital form makes the computer itself an ideal repository for pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last few years. Hard drives with a capacity of more than one hundred gigabytes are quite common. These drives can store hundreds of thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is

-4-

possible to use a video camera to capture an image, to process that image in a computer with a video capture board, and to save that image to a storage medium in another location. Once this is done, there is no readily apparent evidence at the scene of the crime. It is only with careful laboratory examination of electronic storage devices that it may be possible to recreate the evidence trail.

16.    Based upon my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge that graphic image files containing child pornography can be maintained for long periods of time on a computer. Most often the collector maintains the files purposefully. Even when the pornographic files have been deleted (due to guilt or fear of discovery), however, computer forensic experts are nonetheless often able to recover the pornographic images that were purposefully possessed at some previous time from the computer's "unallocated" or "slack" space. In addition, pornographic images can often be recovered from the temporary Internet files, or "cache" of a computer. A forensic examiner often can recover evidence suggesting whether a computer has been used to access e-mail or chat programs, and files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

17.    Based upon my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge that a computerized depiction of child pornography is often stored and referred to as a GIF, short for Graphic Interchange Format, or a JPEG, short for Joint Photographic Experts Group. These image files often contain images or photographs that have been converted into a computer format by the use of a scanner. A single image may be recorded as a single computer file. However, a file may contain two or more images (sometimes

DJW-0177

more than 100), and these files are often referred to as ZIP or SIT files referring to their

compressed archive format. Another type of file is called an MPEG, short for Moving Picture

Experts Group. An MPEG is a file containing a movie or video clip.

18.    Based upon my knowledge, training, and experience, and the experience of other

law enforcement officers, I have knowledge that another method of which child pornographers

are known to store and preserve their collection of images is on transportable media such as a Zip

disk. Such disks can be physically small in nature but have the capacity to store hundreds of

images, movies or other digital media. The small size of the disks makes them compact and

mobile in addition to making them easy to conceal.

## E. **PROBABLE CAUSE**

19.    Based on information I learned from FBI Agents from the Cleveland Division of

the Federal Bureau of Investigation:

    a.    During an online undercover session on January 16, 2007, a Cleveland

Division Undercover Person ("UC") posed as a minor using the AOL screen name

"BlondeeBrit13" in an AOL chat room. During the undercover session, the UC was contacted in

the AOL chat room by an individual using the AOL screen name "Eyemkinkyru2;" this

individual was later identified as WILSON as described below. "Eyemkinkyru2" asked if the UC

was "home alone and horny to play online with an older guy like me babygirl?"

    b.    "Eyemkinkyru2" then e-mailed two pictures of himself (including a photo

in which he was not wearing a shirt), as well as a picture of an erect penis to the UC at the

"BlondeeBrit13" e-mail address. Via e-mail, "Eyemkinkyru2" further stated that he had pictures

of kids engaging in sexual acts. Again via e-mail, "Eyemkinkyru2" transmitted to the UC at the

-6-

"BlondeeBrit13" e-mail address three pictures of minor girls engaging in sexual acts, including: one photo of a minor girl holding a dildo; one photo of a minor girl posed in a sexually suggestive manner on a chair, focusing on her underwear and genitalia or pubic area beneath her skirt; and one photo of a naked, minor female posed in a sexually suggestive manner, focusing on her genitalia or pubic area.

      c.     The Cleveland Division then served AOL with a subpoena to determine who subscribed to the AOL screen name "Eyemkinkyru2." Return information revealed that the subscriber was J. Wilson, located at 4021 Sacramento Street, Concord, CA 64521, telephone number 925.305.9649.

      20.     Through database and other research, I was able to determine that Danny J. Wilson was currently residing with his mother at 2044 Sierra Road, Apartment 4, Concord, California.

      21.     On September 5, 2007, Special Agents from the FBI, including myself, conducted a consensual interview of WILSON at his residence. During the interview, WILSON provided the following information:

      a.     WILSON stated that he uses the AOL screen names "Eyemkinkyru2" and "Jconc7." He admitted that he uses AOL to access the Internet, to participate in explicit online chats, and to send and receive images of minors engaged in sexually explicit conduct. Additionally, WILSON admitted that he sent the e-mails described in paragraph 19(b) above. When asked about the naked girl pictured in one of e-mails WILSON sent to the UC (described in paragraph 19(b)), WILSON stated that he believed she was ten years old.

      b.     WILSON stated that he used the SUBJECT COMPUTER located at his

-7-

residence to access AOL and the Internet. WILSON stated that this was the only computer located at the residence. WILSON further stated that the SUBJECT COMPUTER contained pictures he did not want to show the Special Agents. He stated that he received pictures of "attractive" girls between the ages of 16 and 35, which were contained on the SUBJECT COMPUTER. He also stated that he has received e-mails containing pictures of pre-teens.

        c.      WILSON stated he frequented chat rooms with sexually explicit names. He typically met individuals in a chat room and then engaged them in one-on-one chat sessions. WILSON stated that during one-on-one chat sessions, he typically asked for the age, sex, and location of the other individual with whom he was chatting. WILSON further stated that during one-on-one chat sessions, he typically requested pictures of the other individual with whom he was chatting, and he typically sent pictures of himself to the other individual with whom he was chatting.

        d.      WILSON provided consent to search the SUBJECT COMPUTER.

22.      Based on this information, I have probable cause to believe that the SUBJECT COMPUTER will contain information regarding WILSON's distribution, receipt, and possession of images of minors engaged in sexually explicit conduct.

## F. SEARCH AND SEIZURE OF COMPUTERS AND RELATED STORAGE MATERIALS

23.      I seek authorization to search the SUBJECT COMPUTER and to seize records, documents, materials described in Attachment B to this affidavit and incorporated by this reference.

24.      The terms "records," "documents," and "materials" include all of the items

-8-

described in Attachment B in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or data security devices, including:

a.    Computer Hardware: Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b.    Computer Software: Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

c.    Computer-related Documentation: Computer-related documentation

-9-

consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

        d.     Computer Passwords and Other Data Security Devices:  Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

## G. PERMISSION TO SEARCH COMPUTER EQUIPMENT AND PERIPHERALS

     25.     I have consulted with FBI Supervisory Special Agent (SSA) Christopher J. Beeson, who has been a Special Agent since October 1994.  SSA Beeson is specially trained in computer search and seizure and is certified by the FBI as a member of the FBI Computer Analysis Response Team (CART).  He is also the Director of the Silicon Valley Regional Computer Forensic Laboratory, a crime laboratory dedicated solely to the preservation and examination of digital evidence.  SSA Beeson has received hundreds of hours of training in recovery of digital evidence (computer forensics) and has been a member of the FBI's CART group since 1997.  SSA Beeson has conducted numerous searches and seizures involving computers and computer data, and has advised me of the following:

-10-

a.      Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects: (1) the items themselves may be instrumentalities, fruits, and/or evidence of crime; and/or (2) the items may have been used to collect and store information about crimes (in the form of electronic data). Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are: (1) instrumentalities, fruits and/or evidence of crime; and/or (2) storage devices for information about crimes.

b.      Searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

i.      The volume of evidence:  Computer storage devices can store the equivalent of thousands of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of data search on site.

ii.      Attempted deletion of electronic records and information: Electronic records and information can remain on computer storage media, such as computer hard drives, for an indefinite period of time.  Even when a computer user attempts to delete

-11-

records and information from a computer storage medium, the records and information may still exist and can be recovered through computer forensic techniques. These computer forensic techniques can be time-consuming, and often it would be impractical to do them on site.

      iii.  Technical Requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. For example, on site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically stored (computer) data, document and authenticate the data, and prevent the loss of the data either from accidental or deliberate programmed destruction. In many cases, the evidentiary data can be backed up to government owned computer data storage devices at the site of the search. However, there are circumstances that may necessitate the seizure and removal of the entire computer system and peripheral devices to a secure laboratory setting in order to analyze and extract the evidence. To effect accurate and complete analysis may require seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords) and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is true because the peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the computer expert be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence. In addition, the computer expert needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software

-12-

DJW-0184

which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

## H. ANALYSIS OF ELECTRONIC DATA

26.     The analysis of electronically stored data, whether performed on site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

27.     The search will be conducted pursuant to the Northern District of California protocol for conducting such searches, attached hereto as Attachment C

## I. ITEMS TO BE SEARCHED AND SEIZED.

28.     The items to be searched for and seized are described more fully in Attachment B, which is incorporated fully herein by reference.

29.     Items to be searched include visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256, and other evidence indicating a sexual interest in children, as described more fully in Attachment B.

-13-

## J. CONCLUSION

30.     Based on the information set forth above, I believe, and there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(4)(B) and 2252A(a)(5)(B), which make it a crime to posses child pornography; violations of 18 U.S.C. §§ 2252(a)(2) and 2252A(a)(2), which make it a crime to receive or distribute child pornography in interstate commerce; and violations of 18 U.S.C. §§ 2252(a)(1) and 2252A(a)(1), which make it a crime to transport, ship, or mail child pornography in interstate commerce. Therefore, this application seeks permission to seize and search any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment; digital cameras, scanners, computer photographs, Graphic Interchange Formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange Formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG); and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD ROMs, DVDs, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation; and any hardware/software manuals related to or used for the items described in Attachment B.

## K. REQUEST FOR SEALING.

31.     Since this investigation is continuing, disclosure of the search warrant,  this

-14-

DJW-0186

affidavit, and/or this application and the attachments thereto could jeopardize the progress of the

investigation. Accordingly, I request that the Court issue an order that the search warrant, this

affidavit in support of application for search warrant, the application for search warrant, and all

attachments thereto be filed under seal until further order of this Court.

S. Cort Dugan
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
on this 22ⁿᵈ day of Oct , 2007

THE HONORABLE EDWARD M. CHEN
United States Magistrate Judge

-15-

DJW-0187

# EXHIBIT   D

## ATTACHMENT C

*Most recent effort with changes – January 17, 2006*

United States District Court for the Northern District of California

### PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment, in the Affidavit Supporting the Warrant

1.    In executing this warrant, the government must begin by ascertaining whether all or part of a search of a device or media that stores data electronically (collectively, the "device") that is authorized by this warrant reasonably can be completed at the site within a reasonable time.  If the search reasonably can be completed on site, the government will remove the device from the site only if authorized by law because removal is (1) necessary to preserve evidence, or (2) if the item is contraband, a forfeitable instrumentality of the crime, or fruit of crime.

2.    If the government determines that a reasonable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then completing the search of the mirror image off site (e.g., at a computer crime laboratory).

3.    The government may remove from the search location a device only if the device cannot be searched reasonably on site, or by mirror-imaging or otherwise duplicating its contents for off site examination – unless authorized by law to remove the device because (1) removing the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable instrumentality of the crime,

1

or fruit of crime. The government also may remove from the site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or software manuals) that reasonably appear to be necessary to conduct an off-site search of a device in which data is stored electronically.

4.  If the government removes a device or related equipment or documents from the place they were found in order to complete the search off-site, within ten calendar days of the removal the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

5.  The government must complete an off-site search of a device that agents removed in order to search for evidence of crime as promptly as practicable and no later than 30 calendar days after the initial execution of the warrant. Within thirty calendar days after completing an off-site search of a device pursuant to this warrant, the government must return any device, as well as any related equipment or document that was removed from the site in order to complete the search, unless, under the law, the government may retain the device, equipment, or document (1) to preserve evidence, or (2) because the device, equipment, or document is contraband, a forfeitable instrumentality of the crime, or fruit of crime. Within a reasonable period, not to exceed sixty calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy – and to delete from any devices or storage media or copies that it has retained or made – copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of crime.

The deadlines set forth in this paragraph may be extended by court order for good cause shown.

6.  In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and

2

procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant while, to the extent reasonably practicable, minimizing exposure or examination of irrelevant, privileged, or confidential files.

7.   The terms of this warrant do not limit or displace any person's right to file a motion for return of property under F.R.Cr.P. 41(g). Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or a copy of it.

8.   The government must promptly notify the judge who authorized issuance of the search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arises about rights or interests in any seized or searched item – or any data contained in any searched or seized item – and that dispute cannot be resolved informally. The government must deliver a copy of this written notification to any person known to assert any such right or interest.

DJW-0171

# EXHIBIT   E

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   12/27/2007

On October 22, 2007, the Honorable Edward M. Chen, United States Magistrate Judge, signed a search warrant for an Apple tower computer, part number 620-1100-8AC, bar code JK7274964TQA, and the ZIP disk contained within the Iomega ZIP drive therein, both of which belong to Danny J. Wilson. On October 25, 2007, the computer with ZIP disk was submitted to the Silicon Valley Regional Computer Forensic Laboratory (SVRCFL) for analysis. On November 30, 2007 writer received from the SVRCFL one Digital Versatile Disk, Read Only Memory (DVD-ROM) containing files from the computer and ZIP disk. The following was found during a review of this DVD-ROM:

Thirty-eight sexually suggestive image files of girls that appear to be between the ages of 3 and 11. In eighteen of the images, the girls were nude in sexually suggestive poses, but were not engaging in sexual acts. In five of the images, the girls' genitals were being manually stimulated, and/or they were manually stimulating a male's genitals. In seven of the images, the girls were orally stimulating an adult male's genitals. In four of the images, the girls' genitals were being orally stimulated by adult males. In three of the images, adult males had ejaculated on the girls. In six of the images, adult males were shown engaging in sexual intercourse with the girls.

Forty-five sexually suggestive image files of girls that appear to be between the ages of 12 and 18, or it was not possible to determine their age from the image. In three of these images, the girls were dressed in swimsuits that covered their genitals. In six of the images, the girls were dressed in underwear that covered their genitals. In twenty-three of the images, the girls were nude in sexually suggestive poses, but were not engaging in sexual acts. In four of the images, the girls' genitals were being manually stimulated, and/or they were manually stimulating a male's genitals. In four of the images, the girls were orally stimulating an adult male's genitals. In one of the images, an adult male had ejaculated on the girl. In four of the images, adult males were shown engaging in sexual intercourse with the girls.

One image file, found at the path below:

X:\EnCase\Export\Laptop\Online Downloads\5\incest\brosis.jpg

| | | | DJW-017 |
|---|---|---|---|
| Investigation on | 12/27/2007 | at Oakland, California | |
| File # | | Date dictated | Not dictated |
| by | SA W. M. Herrington:wmh | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# EXHIBIT   F

SV-10 (Rev 08-08-2006)



## SILICON VALLEY
## REGIONAL COMPUTER FORENSIC LABORATORY

| Examiner: | SVRCFL Case Number: |
|---|---|
| Wansin Ounkeo | ███████ |

# Imaging Report

*Included herein are the results of forensic processes performed by qualified computer forensic examiner(s) and/or forensic examiner(s) in training. These processes were performed in accordance with policies and procedures set forth by the Silicon Valley Regional Computer Forensic Lab (SVRCFL).*

**1. Date of Report:** November 7, 2007

**2. Examiner(s):** Wansin Ounkeo, Forensic Examiner; Report Author

**3. Case #:** SVRCFL case ██████
FBI case ██████████

**4. Request:**

Refer to the final report for information on services requested. This report relates to the imaging processes only.

**5. Summary:**

Digital evidence media item(s) were imaged to tape to be retained as archives, and to staging media for future forensic examination by an assigned forensic examiner.

See evidence section of this report for details relating to item(s) imaged.

**6. Examination:**

Prior to conducting any forensic process, legal authority was reviewed by examiner(s) and/or trainee(s).

Upon submission to the SVRCL, each submitted item was inventoried. As part of the inventory process, each item was assigned a unique SVRCFL bar code, and was entered into the SVRCFL evidence system. Where appropriate, make, model, and serial number for each imaged item was recorded, and each item was digitally photographed.

DJW-0075

SV-10 (Rev 08-03-2006)



## SILICON VALLEY
## REGIONAL COMPUTER FORENSIC LABORATORY

| Examiner: | SVRCFL Case Number: |
|---|---|
| Wansin Ounkeo | █████████ |

### 6.1. Basic Input/Output System (BIOS) Check:

Attempts to perform a date and time check of the system containing the imaged media failed. The Open Firmware check is usually performed to record the date, time of the Apple system. The system date and time was not available because the monitor attached to the system would not display anything.

| | |
|---|---|
| **SVRCFL Bar Code:** SVE020419 | **Make:** Apple |
| **Model:** M3548 | **Serial Number:** none visible |
| **BIOS Date:** not known | **Actual Date:** not known |
| **BIOS Time:** not known | **Actual Time:** not known |

### 6.2. Imaging Process(es):

To preserve the original evidence and minimize any risk of damage to the original, an exact copy of the user-accessible data located on the evidentiary item(s) was created onto staging media. (The exact copy will hereafter be referred to as an image.) The image(s) were created using approved forensic imaging software to write to a forensically clean staging media prepared for use in this examination. Unless otherwise noted, the original evidence was write-protected using a hardware-write protection device to prevent any unintentional or accidental destruction or modification of the original evidence. An archive copy was also made using approved software.

The staging media will be used in the examination phase to further satisfy the request, while the archive copy will be retained in the SVRCFL evidence control room as a backup of the original evidence.

An MD5 hash was used to verify that the image(s) created onto the staging media and archive media were accurate duplicates of the data stored on the original evidence. The MD5 value(s) of the image(s) matched the MD5 value of its respective original evidence. All the original evidence was returned to the SVRCFL evidence control room.

The following processes were performed during imaging of the original evidence:

DJW-0076

*SV-10 (Rev 08-03-2006)*



## SILICON VALLEY
## REGIONAL COMPUTER FORENSIC LABORATORY

| Examiner: Wansin Ounkeo | SVRCFL Case Number: ▓▓▓▓▓ |
|---|---|

Physical Examination of Evidentiary items
Write Protect Media
Wiping Media
Hardware Geometry and System Information
Create Image
Verification

## 7. Evidence:

- ▢ Submitted:
  - ○ ▓▓▓▓▓▓▓ Apple M3548 desktop with missing front and top panel with no visible serial number, containing:
    - ▪ SVE020533: Quantum FBTMA655 2.4-GB hard drive with serial number 294634020585
    - ▪ SVE020534: Iomega zip disk: 100 MB with no serial number
- ▢ Imaged:
  - ○ SVE020533: Quantum FBTMA655 2.4-GB hard drive with serial number 294634020585
  - ○ SVE020534: Iomega zip disk: 100 MB with no serial number

## 7.1. Derivative Evidence:

| Item Number | Brand/Model | Block Size | Contents |
|---|---|---|---|
| SVE020533 | Floppy diskette | | Log files from imaging process(es) |
| SVE020538 | Verbatim/ DVD+R | | dd images of SVE020533 (2.4 GB HDD ) and SVE020534 (100 MB Zip disk) |

## 7.2. Staging Media:

DJW-0077

SV-10 (Rev 08-03-2006)



# SILICON VALLEY
# REGIONAL COMPUTER FORENSIC LABORATORY

| Examiner: | | SVRCFL Case Number: |
|---|---|---|
| Wansin Ounkeo | | ▓▓▓▓▓ |

| Make | Model | Serial Number | Contents |
|---|---|---|---|
| Seagate | ST320424A | 3CL0KGFD | dd images of SVE020533 (2.4 GB HDD ) and SVE020534 (100 MB Zip disk) |

## 8. Disposition of Evidence:

  a.  All original evidence item(s) returned to the SVRCFL evidence control room.
  b.  All DE items will be retained in the SVRCFL evidence control room for a period of five years in order to preserve the evidence in the event additional forensic processes or legal proceedings require its use. After this time, the DE will be returned to the requestor's agency for disposition.

## 9. Case Disposition:

This imaging of this case is complete. The staging media will be given to an examiner for additional forensic processing.

DJW-0078

Examiner Initials: _Ou_

# EXHIBIT   G

SV-10 (Rev 10-5-2007)



## SILICON VALLEY
## REGIONAL COMPUTER FORENSIC LABORATORY

| Examiner: Jann Hayes | SVRCFL Case Number: ███ |
|---|---|

# Final Examination Report (to include Imaging Report)

*Included herein are the results of a digital forensic examination performed by a qualified computer forensic examiner. This examination has been performed in accordance with policies and procedures set forth by the Silicon Valley Regional Computer Forensic Lab (SVRCFL).*

**1. Date of Report:**  21 November 2007

**1A. Reference:**  Refer to the imaging report dated November 7, 2007 by FE Wansin Ounkeo attached hereto regarding additional forensic processes relating to this case.

**2. Examiner(s):**  Jann O. H. Hayes, Forensic Examiner; Report Author

**3. Case #:**  RCFL Case #: ███
Agency Case #: ███

**4. Request:**

On 10/25/2007, Special Agent W. M. Herrington, Federal Bureau of Investigation, requested that an Apple desktop computer, and one zip disk, property of Danny Wilson, be examined pursuant to a search warrant. He requested that the items be prepared for his review.

Due to the nature of an Apple computer it cannot be prepared for investigator review. In a telephone conversation on November 9. 2007, Special Agent Cort Dugan requested that all images be provided to him and SA Herrington.

**5. Summary:**

Request was satisfied, and items listed in the request were found as follows:

1) There were 1045 image files, of which 773 were unique. These were placed in a digital report. Amongst these were images of adult pornography, bestiality and probable child pornography.
2) There were 484 multimedia files, of which 434 were unique. These were placed in a digital report.
3) There were no relevant e-mail messages, or chat logs. No file sharing software was installed, other than that provided with AOL.

DJW-0079

SV-10 (Rev 10-5-2007)



## SILICON VALLEY
## REGIONAL COMPUTER FORENSIC LABORATORY

| Examiner: | SVRCFL Case Number: |
|---|---|
| Jann Hayes | |

4) There were four web pages that indicated visits to teen pornography sites; these were placed in a digital report.

## 6. Examination:

SA Dugan provided the SVRCFL with one Apple desktop and one zip disk. Legal authority for the examination was provided as a search warrant that was reviewed by the examiner prior to starting the examination. The evidence items for this case were imaged as indicated in FE Ounkeo's Imaging Report dated November 7, 2007 This report is attached and made a part herein.

Relative to the forensic examination, FE Hayes used forensic software utilities to prepare the examination images of the submitted hard drive and zip disk for review. The following processes were performed to prepare the image for examination:

1) Directory Listing: A listing of all recognized files was created and stored on the staging media in the form of comma delimited text file.

2) Deleted File Recovery: Deleted files were recovered from the evidence drive's free and unallocated areas (i.e. areas not currently being used by the operating system to store files). Data within these deleted files was processed to be viewable by an examiner using forensic examination tools.

3) Hashset filtering: A hashset composed of a list of MD5 hash values was compared to the items contained in the evidence image to determine if any items in the evidence image were a probable match to known contraband files. The NCVIP hashset of 2004 was used to filter for images of child pornography with identified victims. There were no matches.

FE Hayes reviewed the data using appropriate and approved forensic software loaded on a controlled laboratory examination computer or network used exclusively for this purpose. She identified several items to be exported and included in a digital report contained on DVD.

To ensure that the image used for examination had not been altered during the review process, an MD5 hash was run against the examined image at the conclusion of the exam. The post-exam MD5 hash matched the pre-exam MD5 hash, showing that the examined image had not changed during the course of the exam.

SV-10 (Rev 10-5-2007)



# SILICON VALLEY
# REGIONAL COMPUTER FORENSIC LABORATORY

| Examiner: | | SVRCFL Case Number: | |
|---|---|---|---|
| | Jann Hayes | ████████ | |

The following processes were performed during this exam:

> Directory/File Listing
> Erased File Recovery
> Search (Keyword, Filtering, Identifying)
> Internet Processing
> Verification

## 7. Evidence:

### examined:

- SVE020419:  Apple desktop M3548 computer with no visible serial number, containing
  - SVE020533:  Quantum FBTMA 655 2.4GB hard disk drive, serial number 294634020585
  - SVE020534:  Iomega zip disk

### derivative evidence:

- SVE020532:  Floppy diskette containing log files
- SVE020538:  DVD containing archive of SVE020533 and SVE020534
- SVE020742:  DVD containing digital report
- SVE020743:  DVD containing copy of digital report
- SVE020745:  DVD containing archive of exam files

## 8.  Evidence Disposition:

- All original items: SVE020419, SVE020533 and SVE020534 to be returned to submitting agency.

- All DE items:  SVE020532, SVE020538, SVE020743, and SVE020745 are to be retained in SVRCFL evidence control room for a period of five years in order to preserve the evidence in the event additional forensic examinations or legal proceedings require its use.  After this time, they will be returned to the requestor's agency for disposition.

DJW-0081

Examiner/Authenticator

# EXHIBIT  H

AO 93    (Rev. 12/03) Search Warrant

# UNITED STATES DISTRICT COURT

Northern _____ District of California

ORIGINAL
FILED

OCT 3 0 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

Email Address: "Eyemkinkyru2@aol.com"
America Online
466 Ellis Street
Mountain View, CA 94043

**SEARCH WARRANT**

Case Number: 4 - 07 - 7,061

**TO:**  FBI Special Agent S. Cort Dugan _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by   FBI Special Agent S. Cort Dugan _____ who has reason to believe
_____
Affiant

that   ☐ on the person of, or  ✔ on the premises known as (name, description and/or location)
America Online
466 Ellis Street
Mountain View, CA 94043

in the   Northern _____ District of   California _____ there is now

concealed a certain person or property, namely (describe the person or property)

See Attachments A, B & C.  EC

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described
is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before   10/31/2007
_____
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the
search   ✔ in the daytime — 6:00 AM to 10:00 P.M.    ☐ at anytime in the day or night as I find reasonable cause has been
established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person
or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to
Edward M. Chen _____ as required by law.
_____
U.S. Magistrate Judge  (Rule 41(f)(4))

10/22/07 @ 7:30 pm _____ at   San Francisco, California
_____                              _____
Date and Time Issued                                City and State

Magistrate Judge Edward M. Chen _____          _____
Name and Title of Judge                                  Signature of Judge

AO 93    (Rev. 12/03)  Search Warrant (Reverse)

| RETURN | | Case Number: |
|---|---|---|
| DATE WARRANT RECEIVED<br>10/22/2007 | DATE AND TIME WARRANT EXECUTED<br>10/23/2007 @ 2:47 Pm | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH<br>Faxed to AOL (703)265-2505 |
| INVENTORY MADE IN THE PRESENCE OF | | |

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

On 10/23/2007 SA Dugan faxed warrant and Attachmts to AOL. On 10/29/2007 AOL provided ONE CD-ROM and a copy of the warrant to SA Dugan Via Federal Express.

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          10/30/07
Signature of Judge                                        Date

DJW-0146

## ATTACHMENT

## I. SEARCH PROCEDURE.

1.    The search warrant will be presented to America Online ("AOL") personnel by law enforcement agents.  AOL personnel will be directed to isolate those accounts and files described in Section II below;

2.    In order to minimize any disruption of computer service to innocent third parties, AOL employees will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

3.    AOL employees will provide the exact duplicate, in electronic form, of the accounts and files described in Section II below, and all information stored in those accounts and files to law enforcement agents who need not be present during the duplication of the files;

4.    Law enforcement personnel will thereafter review the information stored in the accounts and files received from AOL employees and then identify and copy only the information contained in those accounts and files which are authorized to be further copied as described in Section III below; and

5.    Law enforcement personnel will then seal the original duplicate of the accounts and files received from AOL employees and will not further review the original duplicate absent an order of the Court.

## II. FILES AND ACCOUNTS TO BE COPIED BY AOL EMPLOYEES.

6.    All electronic mail (read and unread), chat, videos, pictures, audio, images, profile data, and any other data stored and presently contained in, or on behalf of, the following e-mail address/account:  Eyemkinkyru2@aol.com.  This includes:

    a.    Printouts of all the above from original storage to include all header information;

    b.    Any and all transactional information, to include log files, of all activity to the above-listed individual which includes dates, time, method of connecting, ports, dial-ups, and/or locations;

    c.    All business records and subscriber information, in any form kept, which pertain to the above listed subscriber and account, including but not limited to applications, subscriber's full name, all screen names associated with that subscriber, method of payment, phone numbers, addresses, and detailed-billing records;

    d.    Any and all information found in the address book, buddy list, friend list, calendar, notepad, groups or other information stored within the account;

DJW-0147

e.    All records indicating the services available to subscriber of the electronic mail address and/or individual described above.

### III. FILES TO BE COPIED BY LAW ENFORCEMENT.

1.    Any and all records stored, maintained or existing for the electronic mail account described in Section II of this Attachment, ~~including~~: *Containing the following :* ℰℒ

a.    Any and all evidence pertaining to violations 18 U.S.C. §§ 2252(a)(4)(B) and 2252A (a)(5)(B), which make it a crime to posses child pornography; violations of 18 U.S.C. §§ 2252(a)(2) and 2252A(a)(2), which make it a crime to receive or distribute child pornography in interstate commerce; and violations of 18 U.S.C. §§ 2252(a)(1) and 2252A(a)(1), which make it a crime to transport, ship, or mail child pornography in interstate commerce;

b.    Electronic messages or other communications to or from Eyemkinkyru2@aol.com;

c.    All videos, pictures, audio, images, profile data, and any other data for Eyemkinkyru2@aol.com;

d.    Information found in the address book, buddy list, friend list, calendar, notepad, or groups;

e.    All internet routing and header information relating to those communications described in Section III, Paragraph 1 of this Attachment;

f.    All subscriber information, in any form kept, which pertain to the email address Eyemkinkyru2@aol.com, including but not limited to applications, subscriber's full names, all screen names associated with the subscriber and accounts, all account names associated with those subscribers, method of payment, phone numbers, addresses, and detailed-billing records.

# EXHIBIT  I

# AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, S. Cort Dugan, being first duly sworn, hereby depose and state as follows:

## A. INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search a certain

e-mail account controlled by America Online ("AOL"), a web-based e-mail provider, located on

AOL's servers at 466 Ellis Street, Mountain View, California 94043 and/or 22000 AOL Way,

Dulles, Virginia 20166. The e-mail account to be searched is Eyemkinkyru2@aol.com (the

"SUBJECT ACCOUNT") and is further described below and in Attachment A. As set forth

herein, there is probable cause to believe that on the computer systems of AOL, there exists

evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(4)(B) and 2252A

(a)(5)(B), which make it a crime to posses child pornography; violations of 18 U.S.C. §§

2252(a)(2) and 2252A(a)(2), which make it a crime to receive or distribute child pornography in

interstate commerce; and violations of 18 U.S.C. §§ 2252(a)(1) and 2252A(a)(1), which make it

a crime to transport, ship, or mail child pornography in interstate commerce.

2. The SUBJECT ACCOUNT is believed to belong to Danny J. Wilson

("WILSON"). In sum, the investigation involves WILSON's receipt and distribution of images

of minors engaged in sexually explicit conduct using the SUBJECT ACCOUNT. On September

5, 2007, WILSON admitted to using the SUBJECT ACCOUNT for these purposes.

3. Because this affidavit is being submitted for the limited purpose of securing a

search warrant for the SUBJECT ACCOUNT, I have set forth only the facts that I believe are

necessary to establish probable cause to believe that fruits, evidence, and instrumentalities of

-1-

violations of federal law will be located in the SUBJECT ACCOUNT.

## B. AGENT BACKGROUND

4.      I have been employed by the FBI since January 2005. I am currently located in

the Oakland Resident Agency of the San Francisco Division. I am assigned to the San Francisco

Criminal Cyber Squad, which investigates crimes involving computer intrusions, sexual

exploitation of minors, including such exploitation via the Internet and computers, and other

computer-related violations.

5.      In my capacity as a Special Agent, I investigate a variety of violations of federal

law, including possession and distribution of child pornography and the sexual exploitation of

children. During the investigation of these cases, I have participated in the execution of search

and arrest warrants, and have seized evidence of violations of United States law. I have

interviewed witnesses and have read official reports of similar interviews by other investigators.

As a Special Agent, I am authorized to investigate crimes involving the sexual exploitation of

children via the use of the Internet and/or child pornography, and I am a law enforcement officer

with authority to execute arrest and search warrants under the authority of the United States.

6.      The statements and conclusions set forth in this affidavit are based upon the facts

related in this affidavit, which I learned from my personal investigation or from other

investigators in this case. Also, the statements and conclusions in this affidavit are based on my

training and experience and on information relayed to me by other federal, state and local law

enforcement officers.

## C. DEFINITIONS

7.      The term "minor" as used herein is defined in Section 2256(1) of Title 18 of the

DJW-0151

United States Code as any person under the age of eighteen years.

8.      The term "visual depiction" as used herein is defined in Section 2256(5) of Title

18 of the United States Code to include "undeveloped film and videotape, and data stored on

computer disk or by electronic means which is capable of conversation into a visual image."

9.      The term "sexually explicit conduct" as used herein is defined in Section 2256(2)

of Title 18 of the United States Code as "actual or simulated (I) sexual intercourse, including

genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or

opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious

exhibition of the genitals or pubic area of any person."

### D. BACKGROUND REGARDING COMPUTERS, INTERNET, E-MAIL, AND AOL

10.     Based upon my knowledge, training, and experience, and the experience of other

law enforcement officers, I have knowledge of the Internet and how it operates.  I know that the

Internet is a worldwide computer network, which connects computers and allows

communications and transfer of information and data across state and national boundaries.

Individuals who utilize the Internet can communicate by using electronic mail ("e-mail").  The

following paragraphs describe some of the functions and features of the Internet as it relates to

the subject of this search warrant.

11.     Internet Service Providers ("ISPs"):  Individuals who have an Internet account and

an Internet based e-mail address must have a subscription, membership or affiliation with an

organization or commercial service which provides access to the Internet.  A provider of Internet

access and services is referred to as an Internet Service Provider, or ISP.

12.     E- Mail:  E-mail is an electronic form of communication, which usually contains

-3-

written correspondence. It is similar to conventional paper mail in that it is addressed from one

individual to another. An e-mail usually contains a message "header" which generally displays

the sender's e-mail address, the recipient's e-mail address, and the date and time of the e-mail

transmission. If a sender chooses to do so, he or she can type a subject line into the header.

E-mail message headers usually contain information, such as the sender's ISP, which enables law

enforcement officers to trace the message back to the original sender. In addition, the user can

choose to enter an identity, usually a name or nickname, which will be displayed to those to

whom he/she sends the e-mail. When an e-mail is sent by the sender, this identity may hide the

sender's e-mail address in such a way that the recipient may not be able to determine the sender's

e-mail address.

    13.    Internet Addresses: Every device in the Internet has an address that allows other

devices to locate and communicate with it. An Internet Protocol ("IP") address is a unique

number that identifies a device on the Internet. Other addresses include Uniform Resource

Locator ("URL") addresses, such as http://www.dea.gov, which are typically used to access web

sites or other services or remote devices. Domain names of web sites, host names, and machine

addresses are other types of addresses associated with Internet use. Domain name registrars

contain registration information concerning the identity of the owner of a domain name.

    14.    AOL: Based on my training and experience and conversations with other FBI

Agents who have experience with computer-related crime investigations, I have learned the

following about e-mail ISPs, including AOL:

        a.    The e-mail ISP provides an e-mail service which is available for a monthly

charge or for free to Internet users and subscribers. Subscribers obtain an account by registering

-4-

on the Internet with the e-mail ISP. The ISP requests subscribers to provide basic information,

such as name, address, city, state, zip code, day and evening telephone numbers, billing method

(credit or debit), name of credit card holder, credit card number, and expiration date. Once an

AOL account is created, the user can create multiple screen names associated with the e-mail

account. Additionally, the user can create a personal profile and provide personal and/or

biographical information;

        b.      The e-mail ISP maintains electronic records pertaining to the individuals

and companies for which they maintain subscriber accounts. These records include account

access information, e-mail transaction information, and account application information;

        c.      Subscribers to the e-mail ISP may access their accounts on servers

maintained and/or owned by the ISP from any computer connected to the Internet located

anywhere in the world;

        d. .     Any e-mail that is sent to a subscriber is stored in the subscriber's

"mailbox" on the ISP's servers until the subscriber deletes the e-mail or the subscriber's mailbox

exceeds the storage limits preset by the e-mail ISP. If the message is not deleted by the

subscriber, the account is below the maximum limit, and the subscriber accesses the account

periodically, that message can remain on the ISP's servers indefinitely;

      ·e.      When the subscriber sends an e-mail, it is initiated at the user's computer,

transferred via the Internet to the e-mail ISP's servers, and then transmitted to its end destination.

ISP users have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail

specifically deletes the e-mail from the ISP server, the e-mail can remain on the system

indefinitely. The sender can delete the stored e-mail message thereby eliminating it from the e-

DJW-0154

mail box maintained at the e-mail ISP, but that message will remain in the recipient's e-mail box unless the recipient deletes it or unless the recipient's account is subject to account size limitations;

      f.     A subscriber can store files, including e-mails and image files, on servers maintained and/or owned by the e-mail ISP; and

      g.     E-mails and image files stored on an e-mail ISP server by a subscriber may not necessarily be located in the subscriber's home computer. The subscriber may store e-mails and/or other files on the ISP server for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer in his/her residence. A search of the files in the computer in the subscriber's residence will not necessarily uncover the files that the subscriber has stored on the ISP server.

    15.     Based on my discussions with an AOL representative, I have learned that e-mails in AOL subscribers' accounts may be stored on AOL servers located in either Mountain View, California or Dulles, Virginia. AOL has informed law enforcement authorities that AOL will retrieve account information and e-mails requested in a search warrant, regardless of where the information is physically stored by AOL, whenever such a warrant is served on AOL at its home office in Dulles, Virginia.

### E. STORED WIRE AND ELECTRONIC COMMUNICATION ACCESS

    16.     Title 18, United States Code, Chapter 121, Sections 2701 through 2711, is entitled "Stored Wire and Electronic Communications and Transactional Records Access."

      a.     Title 18, United States Code, Section 2703(a) provides, in part:

           A governmental entity may require the disclosure by

DJW-0155

a provider of electronic communication service of the contents of an electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of an electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

b.  Title 18, United States Code, Section 2703(b) provides, in part:

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection –

(A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant...

(2) Paragraph (1) is applicable with respect to any electronic communication that is held or maintained on that service –

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for

DJW-0156

purposes of providing any services other than
storage or computer processing.

c.    The government may also obtain records and other information
pertaining to a subscriber to or customer of an electronic
communication service or remote computing service by way of a
search warrant. 18 U.S.C. § 2703(c). No notice to the subscriber
or customer is required. 18 U.S.C. § 2703(c)(2).

d.    Title 18, United States Code, Section 2711, provides, in part:

As used in this chapter –

(1) the terms defined in section 2510 of this title
have, respectively, the definitions given such terms
in that section; and

(2) the term "remote computing service" means the
provision to the public of computer storage or
processing services by means of an electronic
communications system.

e.    Title 18, United States Code, Section 2510, provides, in part:

(8) "contents," when used with respect to any wire,
oral, or electronic communication, includes any
information concerning the substance, purport, or
meaning of that communication; . . .

(14) "electronic communications system" means
any wire, radio, electromagnetic, photooptical or
photoelectronic facilities for the transmission of
electronic communications, and any computer
facilities or related electronic equipment for the
electronic storage of such communications; . . .

(15) "electronic communication service" means any
service which provides to users thereof the ability to
send or receive wire or electronic communications; .
. .

(17) "electronic storage" means --

-8-

(A) any temporary, intermediate storage
of a wire or electronic communication incidental
to the electronic transmission thereof; and

(B) any storage of such communication by
an electronic communication service for purposes of
backup protection of such communication.

### F. **PROBABLE CAUSE**

17.    Based on information I learned from FBI Agents from the Cleveland Division of

the Federal Bureau of Investigation:

a.    During an online undercover session on January 16, 2007, a Cleveland

Division Undercover Person ("UC") posed as a minor using the AOL screen name

"BlondeeBrit13" in an AOL chat room. During the undercover session, the UC was contacted in

the AOL chat room by an individual using the AOL screen name "Eyemkinkyru2;" this

individual was later identified as WILSON as described below. "Eyemkinkyru2" asked if the

UC was "home alone and horny to play online with an older guy like me babygirl?"

b.    "Eyemkinkyru2" then e-mailed two pictures of himself (including a photo

in which he was not wearing a shirt), as well as a picture of an erect penis to the UC at the

"BlondeeBrit13" e-mail address. Via e-mail, "Eyemkinkyru2" further stated that he had pictures

of kids engaging in sexual acts. Again via e-mail, "Eyemkinkyru2" transmitted to the UC at the

"BlondeeBrit13" e-mail address three pictures of minor girls engaging in sexual acts, including:

one photo of a minor girl holding a dildo; one photo of a minor girl posed in a sexually

suggestive manner on a chair, focusing on her underwear and genitalia or pubic area beneath her

skirt; and one photo of a naked, minor female posed in a sexually suggestive manner, focusing on

her genitalia or pubic area.

-9-

c.     The Cleveland Division then served AOL with a subpoena to determine who subscribed to the AOL screen name "Eyemkinkyru2." Return information revealed that the subscriber was J. Wilson, located at 4021 Sacramento Street, Concord, CA 64521, telephone number 925.305.9649.

18.     Through database and other research, I was able to determine that Danny J. Wilson was currently residing with his mother at 2044 Sierra Road, Apartment 4, Concord, California.

19.     On September 5, 2007, Special Agents from the FBI, including myself, conducted a consensual interview of WILSON at his residence. During the interview, WILSON provided the following information:

a.     WILSON stated that he uses the AOL screen names "Eyemkinkyru2" and "Jconc7." He admitted that he uses AOL to access the Internet, to participate in explicit online chats, and to send and receive images of minors engaged in sexually explicit conduct. Additionally, WILSON admitted that he sent the e-mails described in paragraph 17(b) above. When asked about the naked girl pictured in one of e-mails WILSON sent to the UC (described in paragraph 17(b)), WILSON stated that he believed she was ten years old.

b.     WILSON stated that he used an Apple tower computer located at his residence to access AOL and the Internet. WILSON stated that this was the only computer located at the residence. WILSON further stated that the computer contained pictures he did not want to show the Special Agents. He stated that he received pictures of "attractive" girls between the ages of 16 and 35, which were contained on his computer. He also stated that he has received e-mails containing pictures of pre-teens.

-10-

c.      WILSON stated he frequented chat rooms with sexually explicit names. He typically met individuals in a chat room and then engaged them in one-on-one chat sessions. WILSON stated that during one-on-one chat sessions, he typically asked for the age, sex, and location of the other individual with whom he was chatting.  WILSON further stated that during one-on-one chat sessions, he typically requested pictures of the other individual with whom he was chatting, and he typically sent pictures of himself to the other individual with whom he was chatting.

20.     Based on this information, I have probable cause to believe that the SUBJECT ACCOUNT will contain information regarding WILSON's distribution, receipt, and possession of images of minors engaged in sexually explicit conduct.

## G. SEARCH PROCEDURE

21.     In order to ensure that agents search only those computer accounts and/or files described in Attachment A, this affidavit and application for search warrant seeks authorization to permit employees of AOL to assist agents in the execution of this warrant.  To further ensure that agents executing this warrant search only those computer accounts and/or files described in Attachment A, the following procedures will be implemented, and will also be set forth in Attachment A:

a.      The search warrant will be presented to AOL personnel who will be directed to isolate those accounts and files described in Attachment A;

b.      In order to minimize any disruption of computer service to innocent third parties, AOL employees and law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Attachment A,

-11-

including an exact duplicate of all information stored in the computer accounts and files described in Attachment A;

      c.     AOL employees will provide the exact duplicate in electronic form of the accounts and files described in Attachment A and all information stored in those accounts and files to the agent who serves this search warrant;

      d.     Law enforcement personnel will thereafter review the information stored in the accounts and files received from AOL employees and then identify and copy the information contained in those accounts and files which are authorized to be further copied by this search warrant; and

      e.     Law enforcement personnel will then seal the original duplicate of the accounts and files received from AOL employees and will not further review the original duplicate absent an order of the Court.

## H. CONCLUSION

22.     Based on the information set forth above, I believe there is probable cause to believe, that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251, 2252, and 2252A will be found in the SUBJECT ACCOUNT, which is the e-mail account used by WILSON to send and receive images of minors engaged in sexually explicit conduct. Therefore, I respectfully request that a warrant issue permitting me to search the SUBJECT ACCOUNT described in Attachment A in the manner set forth in that attachment.

## I. REQUEST FOR SEALING

23.     Since this investigation is continuing, disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto could jeopardize the progress of the

DJW-0161

investigation.  Accordingly, I request that the Court issue an order that the search warrant, this

affidavit in support of application for search warrant, the application for search warrant, and all

attachments thereto be filed under seal until further order of this Court.


S. Cort Dugan
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
on this 22nd day of Oct. , 2007


THE HONORABLE EDWARD M. CHEN
United States Magistrate Judge

-13-

DJW-0162

# EXHIBIT   J



# America Online

## Compliance & Investigations

22000 AOL Way
Dulles, VA  20166

## Law Enforcement Training Manual

(703) 265-COPS (2677)
Or
(703) 265-1933

Fax: (703) 265-2305

# Current AOL Retention Periods

· Basic Subscriber Information: 6 months (including log on/off times)

· Unread and Sent Mail:  28  Days

· Read Mail: 2 days

· Member Internet Protocol (IP) Addresses: 60 - 90 days

· Proxy Server IP: up to 7 days max
  (Sometimes 1 or 2 days)

· IP connection Log Data:  approx. 90 days (specific date and time required)

· ICQ
  · UIN Required for search
  · Can not search on real name
  · Can not search on nicknames as they are not unique

· AIM
  · IP Connection Log Data:  14 days (specific date and time required)

\*All retention periods are approximate and can vary depending on system usage.